IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CIMC VEHICLES GROUP CO., LTD., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-10-709 |
| | § | |
| DIRECT TRAILER, LP, DIRECT | § | |
| CHASSIS AND EQUIPMENT CO, | § | |
| | § | |
| Defendants, | § | |

## <u>AMENDED MEMORANDUM, RECOMMENDATION, AND ORDER</u>[1]

Pending before the court[2] are Plaintiff's Motion for Partial Summary Judgment (Doc. 42), Plaintiff's Motion to Strike Portions of the Affidavits of John Nelson ("Nelson") and John Quaid ("Quaid") (Doc. 54), and Plaintiff's Motion to Strike Affirmative Defenses and to Dismiss Counterclaims (Doc. 67).  The court has considered the motions, the responses, all other relevant filings, and the applicable law.

For the reasons set forth below, the court **DENIES** Plaintiff's motion to strike and **RECOMMENDS** that both dispositive motions be **GRANTED IN PART AND DENIED IN PART.**

## I.  Case Background

Plaintiff filed this contract action in March 2010 against two

---

[1]    Having considered Plaintiff's objections to the Memorandum and Recommendation dated July 12, 2012, and Defendants' responses thereto, the court issues this amended memorandum.

[2]    This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72.  Doc. 46.

entities, Defendants Direct Trailer, LP, ("DTLP") and Direct Chassis and Equipment Co. ("DCEC"), for breach of two manufacturing contracts.[3]  Defendants answered and filed counterclaims.[4]

## A.  **Factual Background**

Plaintiff is a company that is organized under the laws of the People's Republic of China and manufactures commercial vehicles.[5] Defendant DCEC, a Texas corporation, is in the business of repairing intermodal chassis for the movement of shipping containers from one mode of transportation to another.[6]  The parties began their business relationship in 2004, when Plaintiff, operating in China, began manufacturing component parts called "frame weldments" that Defendant DCEC used to "remac"[7] chassis in the United States.[8]

In mid-2005, Nelson, the president and chief executive officer of Defendant DCEC, met with the vice general manager of Plaintiff,

---

[3]     See Doc. 1, Pl.'s Original Compl.

[4]     See Doc. 9, Defs.' Answer to Pl.'s Original Compl.

[5]     See Doc. 20, Pl.'s 1st Am. Compl., p. 1.

[6]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 41, see also Doc. 20, Pl.'s 1st Am. Compl., p. 1.

[7]     Quaid described the remac process as the third in intensity of four levels of repair.  Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 42.

[8]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 45; see also Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 48.

David Li ("Li"), to discuss manufacturing flatbed[9] trailers[10] for sales in the United States.[11]   Under the proposed arrangement, Plaintiff would produce the frame weldment component parts and ship them to the United States where Defendants would assemble and sell the trailers.[12]

In April 2006, Defendant DTLP was formed to handle the flatbed-trailer business.[13]   Because Defendant DTLP was a newly formed company at the time, Nelson and Li decided that the initial contract for this business endeavor should be between Plaintiff and Defendant DCEC in order to meet Plaintiff's criteria for entering the business deal.[14]   According to Nelson, Plaintiff and Defendant

---

[9]     With apparent randomness, the parties vacillate between "flatbed" as one word and "flat bed" as two words.  The correct spelling is as one word.  See Webster's New World Dictionary 514 (3d College Ed. 1988).  Nevertheless, when quoting, the court spells the term as it appeared in that particular source material.

[10]     Flatbed trailers are trailers with no sides that are designed to carry large freight.  Cf. Webster's New World Dictionary 514 (3d College Ed. 1988)(defining flatbed).  "Flatbeds are more designed around the home building industry; dropdecks are more around the commercial equipment industry," explained Nelson.  Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 127-28.  Defendants manufactured both types of trailers.  See id.

[11]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 46; Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 34; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 2.

[12]     Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 2.

[13]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 50.

[14]     See Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 45-46; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 3.

DCEC "had a great history already going."[15]

On July 18, 2006, Nelson, representing Defendant DCEC, and Li, representing Plaintiff, executed an agreement covering the manufacture and sale of flatbed trailers ("Master Agreement").[16] In pertinent part, the Master Agreement stated:

> CIMC has agreed to sell to DCEC and DCEC has agreed to purchase from CIMC, Frame Weldments that when assembled with axles, landing gear, suspensions and various other running gear components shall become a new flat bed trailer. Each batch of Frame Weldments will be supported by a[n] individual Purchase Order from DCEC and will be covered under the terms of this Master Agreement. The individual Purchase Order shall be placed quarterly and cover the quantity mutually agreed schedule [sic] for manufacture in the quarter.
>
> . . . .
>
> CIMC and DCEC agree to work together honestly to develop Flat Bed Trailer market in US. Both parties agree to justly and openly price the Frame Weldment based on real cost plus margin sharing. In order to achieve that, CIMC agrees to provide DCEC the real cost occurred [sic] in CIMC side for manufacturing and delivery [of] such Frame Weldment. DCEC agrees to provide CIMC the real cost occurred [sic] in DCEC side for final assembling and Sales for such Frame Weldment to become a completed Flat Bed Trailer and the sale price of such completed Flat Bed Trailer. With mutually agreed real cost on each side and sale price of completed Flat Bed Trailer, both parties shall share the margin achieved equally.
>
> Margin = Sale Price – [DCEC's Cost + CIMC's Cost]
> Price of Frame Weldment = CIMC's Cost + 0.5 * Margin
>
> Both parties shall further and continuously work together on cost reduction program. Any cost saving shall be

---

[15]    Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 45.

[16]    See Doc. 42-1, Ex. A to Pl.'s Mot. for Partial Summ. J., Master Agreement.

shared equally by both parties.

The price per completed unit shall be as detailed in the Individual Purchase Orders mentioned above.

DCEC will provide CIMC the Contract of sale [for] the Flat Bed Trailer for backup.  Each party shall notice the counterpart [of] the execution of cost reduction program occurred [sic] in its side for backup.  The actual margin difference brought by sale prices of Flat Bed Trailer and cost reduction program shall be accounted and the amount shall be reflected in the price of [the] next individual Purchase Order.

. . . .

CIMC shall invoice DCEC each week by electronic e-mail for units shipped the previous week.  CIMC's invoice shall include date, Frame Weldment Production Number, number of Frame Weldments and all shipping information as required for each Container delivered to the Port of Shenzhen.  DCEC shall transfer payment for the delivered Frame Weldment [sic] within thirty (30) days after final acceptance.[17]

Other documents in the record suggest the attachment of a series of purchase orders to the Master Agreement, but the copies of the contract submitted by the parties have no documents attached.[18]

Defendant DTLP provided Plaintiff with drawings and specifications for the manufacture of each order of frame

---

[17]  Id. at pp. 1-2 (unnumbered).

[18]  See Doc. 42-1, Ex. A to Pl.'s Mot. for Partial Summ. J., Master Agreement; Doc. 48-1, Ex. A to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Master Agreement; Doc. 42-3, Exs. L-S to Pl.'s Mot. for Partial Summ. J., Change Orders Dated Feb. 7, 2007;  Doc. 48-2, Exs. TT, VV, XX to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Orders Dated July 23, 2006; Doc. 48-2, Ex. LL to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Order Dated Nov. 14, 2006; Doc. 48-2, Exs. X-Z, AA-BB, DD, FF, HH, JJ-KK, MM, OO-QQ, UU, WW to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Change Orders Dated Feb. 7, 2007; Doc. 48-2, Ex. II to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Change Order Dated Feb. 13, 2007; Doc. 48-2, Exs. CC, EE, GG, NN, RR-SS to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Change Orders Dated Mar. 16, 2007.

weldments.[19]   After the construction of a prototype and discussion about design, materials, and cost, Plaintiff estimated a price for each order.[20]   Li and Nelson signed each purchase order before Plaintiff began manufacturing the requested units of frame weldment.[21]   The first three purchase orders were for units of steel frame weldment and were dated July 23, 2006.[22]  All three of those purchase orders stated, "The terms of margin review specified as [sic] Master Agreement will be not available for this PO due to CIMC has [sic] offered incentive price."[23]

Although the first three purchase orders were priced solely on anticipated cost of manufacture, Plaintiff's company policies

---

[19]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 66.

[20]     Id. at pp. 66-67.

[21]     Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 51, 131; see also Doc. 48-1, Ex. F to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Jim Shen, p. 65 (stating that the purchase order had to be signed before Plaintiff could begin manufacturing the units).

[22]     See Doc. 48-2, Exs. TT, VV, XX to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Orders Dated July 23, 2006.
       These purchase orders were labelled FBS 1, FBS 2, FBC 3.   See id. Plaintiff explained in its brief that "FBS" stood for flatbed steel and "FBC" stood for flatbed composite.  See Doc. 42, Pl.'s Mot. for Partial Summ. J., p. 5 n.1.  Even though the third purchase order was labeled "FBC 3," the face of the order itself specifies "51 units of steel frame weldment."  Doc. 48-2, Ex. XX to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Order Dated July 23, 2006.
       The summary judgment record does not contain all of the original purchase orders.  In fact, the only other two located by the court in addition to these first three are dated November 14, 2006 and March 16, 2007.  See Doc. 48-2, Ex. LL to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Order Dated Nov. 14, 2006; Doc. 48-2, Ex. SS to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Order Dated Mar. 16, 2007.

[23]     Doc. 48-2, Exs. TT, VV, XX to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Orders Dated July 23, 2006; see also Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p.  111 ("That means that there would be no estimated margin payable to CIMC on this purchase order.")

required that, in subsequent purchase orders, the price of the frame weldment units include Plaintiff's cost and its share of the target margin.[24] Plaintiff's Jim Shen explained in an email to Jim Wilfore of Defendant DTLP, Nelson and others:

> I have talked with Steven [Feng, one of Plaintiff's employees,] about revising POs of flatbed [sic]. I appreciate that you and Steven work together in the way of Working Protocol [sic] and have clarified the BOM [(bill of materials)] and cost structure for each PO. So it's necessary to revise the POs of #4 to #22 by the correct cost which you've figured out.
>
> Meanwhile, the previous prices of flatbed weldment specified in POs were only based on CIMC's expense and without include [sic] the part of target margin which shall be shared by CIMC. Pricing like this are [sic] not accepted as per our company policy. I think you have understood and agreed to it as I noticed that you suggested to specify Ex-work cost and target margin in PO separately. We disagree your [sic] suggestion just [sic] do not want to make trouble internally because CIMC never specify [sic] margin in any PO before. I think the difference between us is only a documental [sic] format problem. So I hope you could kindly understand our company policy and agree the revising way we presented [sic]. If necessary, I suggest to set [sic] conference call to discuss.
>
> In addition, [i]t's worse that all signed POs of Drop Deck even have no BOM, no cost structure and no target sale price. [Li] is very disappointed to my job [sic]. I [would] appreciate if you could address it as soon as possible. I understand the prototype of Drop Deck is not finished yet. But [i]t won't stop we [sic] use "projected" data.[25]

Steven Feng ("Feng") of Plaintiff's International Sales Department, drafted a purchase order addendum "[a]ccording to the

---

[24]   See generally Doc. 48-1, Ex. G to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Emails Between Pl. & Defs.

[25]   Doc. 48-1, Ex. G to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Email from Jim Shen to Jim Wilfore, et. al, Dated Jan. 18, 2007.

pricing method discussed by Jim Shen with [Nelson], with the confirmed breakdown of flatbed cost structures."[26]   The parties executed the addendum on January 29, 2007,[27] which applied to "580 units of steel flatbed"[28] on seven identified purchase orders and "725 units of steel/Aluminum (composite) flatbed" on six identified purchase orders.[29]   Attached to the addendum was a chart detailing the price of each unit of flatbed and the pricing formula, including the target sales price for each completed flatbed and the target margin.[30]   The addendum stated:

> Both parties agree to do necessary minor price adjustment according to actual cost change [sic] both [sic] agreed during executing the PO and sale price difference [sic] between real price and target price when the PO is closed (which is defined as all units in such PO have been sold out). DCEC shall provide CIMC Vehicles the real sale price within one week after each PO is

---

[26]    Doc. 48-2, Ex. I to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Email from Steven Feng to Nelson, et. al, Dated Jan. 10, 2007.

[27]    Although undated, the addendum number (FB-20070129) appears to reference the date it was executed.   See Doc. 42-2, Ex. G to Pl.'s Mot. for Partial Summ. J., January 2007 Purchase Order Addendum; accord Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 7 (describing a purchase order addendum executed "on or about January 29, 2007" that, according to his description, appears to be this one).

[28]    The addendum uses the term "flatbed" to describe the units Defendant DCEC ordered from Plaintiff; however, that term actually refers to the completed trailer, rather than "frame weldment."   See Doc. 42-1, Ex. A to Pl.'s Mot. for Partial Summ. J., Master Agreement (explaining that the frame weldments would be assembled in to flatbed trailer); Doc. 42-2, Ex. G to Pl.'s Mot. for Partial Summ. J., January 2007 Purchase Order Addendum (using the words "units of steel flatbed when discussing the subject matter of the purchase orders between Plaintiff and Defendants).   The court cannot tell from the documents in evidence whether the parties used the two terms interchangeably, they intended a difference in meaning, or they were merely careless with their choice of words.

[29]    Doc. 42-2, Ex. G to Pl.'s Mot. for Partial Summ. J., January 2007 Purchase Order Addendum.

[30]    Id. at Attach. 1, Pricing Chart.

closed. Both parties will record agreed price adjustment in written form and invoice the reimbursement [sic] each other directly within two weeks after the adjustment.[31]

Defendants expected delivery of the first orders of steel frame weldment units by late June 2006[32] but did not receive them until several months later.[33] The initial set of composite units, which were ordered after the steel units, were also several months late.[34] Defendants discovered "a multitude of defects including poor welds, rust and poor paint work" that required repair before the weldments could be used in the trailers.[35] The majority of the trailers were not completed for sale until mid-2007.[36] By then, the market for flatbed trailers "got cold or slowed down," according to

---

[31]     Doc. 42-2, Ex. G to Pl.'s Mot. for Partial Summ. J., January 2007 Purchase Order Addendum.

[32]     The purchase orders for these units of frame weldment were not signed until July 2006. See Doc. 48-2, Exs. TT, VV, XX to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Purchase Orders Dated July 23, 2006. Nelson asseverated, nevertheless, that Defendants expected delivery in early summer 2006. Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 8. Quaid explained that the development process had been initiated many months before the completion of the purchase orders. Doc. 48-2, Ex. H to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, pp. 116-17.

[33]     Doc. 48-1, Ex. B to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 38-40; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 8; Doc. 48-2, Ex. H to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, pp. 115-16.

[34]     Doc. 48-1, Ex. B to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 38-39; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 8; Doc. 48-2, Ex. H to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, pp. 115-17.

[35]     Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 8; see also Doc. 48-1, Ex. B to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 55-56; Doc. 48-1, Ex. D to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Quaid, ¶ 3.

[36]     Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 11.

Nelson, and Defendants were not able to sell them as quickly as they were being manufactured, instead storing them until the market improved.[37]  Defendants fell behind on payment to Plaintiff for the frame weldment units.[38]

The parties entered another purchase order addendum later that year[39] that applied to 285 steel units and 400 composite units on eight of the thirteen purchase orders addressed in the January 2007 addendum.[40]  This second addendum stated: "To promote the sales and simplify the operation, both parties understand and agree to price each specified PO above by CIMC's cost plus fixed markup instead of profit sharing pricing."[41]  The "Ex-work Price"[42] per steel unit was set at $8,021.45 and per composite unit was set at $9,187.43.[43]  The parties applied this pricing structure not only to the referenced

---

[37]     Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 60; see also Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶¶ 8, 11, 12.

[38]     See Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 62.

[39]     The addendum number is FB-20070726, seemingly indicating an execution date of July 26, 2007.

[40]     Doc. 42-2, Ex. H to Pl.'s Mot. for Partial Summ. J., July 2007 Purchase Order Addendum.

[41]     Id.

[42]     According to the January 2007 addendum, the "EXW Price," which the court deduces is the same as the "Ex-work Price," was defined as CIMC materials and labor costs plus one-half of the target margin minus delivery cost.  See Doc. 42-2, Ex. G to Pl.'s Mot. for Partial Summ. J., January 2007 Purchase Order Addendum, Attach. 1, Pricing Chart.

[43]     Doc. 42-2, Ex. H to Pl.'s Mot. for Partial Summ. J., July 2007 Purchase Order Addendum.

purchase orders but to all subsequent orders.[44]

In September 2008, more than two years after entering the Master Agreement, Nelson and Li discussed setting a time frame for payment of the units that Plaintiff had already manufactured and shipped.[45]  Li indicated to Nelson that an agreement was necessary because Plaintiff's "internal people" required a time frame within which Defendants would pay Plaintiff for the frame weldments that had been produced and shipped to Defendants.[46]  Nelson and Li executed an agreement entitled Flatbed Agreement.[47]  While Li signed the Flatbed Agreement on behalf of Plaintiff, as he had the Master Agreement, Nelson signed it on behalf of Defendant DTLP rather than Defendant DCEC.[48]  The Flatbed Agreement began:

> Direct Trailer LP (DTLP) fully took over the Master Agreement for All Flat Bed [sic] dated July 18th, 2006 (herein called MPO) assigned by Direct Chassis & Equipment Company (DCEC) and fully accept [sic] the benefits and obligations of the MPO.  CIMC Vehicles Group Co., Ltd (CIMC) fully understood and accepted this assignment.[49]

---

[44]    Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 10.

[45]    See Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 133, 137.

[46]    See id. at p. 138.

[47]    See Doc. 42-1, Ex. B to Pl.'s Mot. for Partial Summ. J., Flatbed Agreement.  The numbering of the pages of the Flatbed Agreement indicate that the document had four pages, but both copies in the record have two pages each.  See id.; Doc. 48-2, Ex. V to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Flatbed Agreement.

[48]    See Doc. 42-1, Ex. B to Pl.'s Mot. for Partial Summ. J., Flatbed Agreement, p. 2.

[49]    Id. at Introductory ¶.

11

The contract detailed a "mutual agreement" reached by the parties on the payment for "165 units of steel flatbed and 250 units of composite flatbed, which were shipped by CIMC to DTLP but not paid."[50]

> CIMC and DTLP agreed for the inventory steel flatbed which have been shipped to US but not paid, which is [sic] total 165 units in PO# FBS-2, FBS-4, FBS-5, and FBS-7, whatever sold unit by DTLP [sic] will be paid off immediately after DTLP received [sic] payment from its customer.  The deadline for payment of the total 165 units is June 30, 2009.  Any open balance is paid [sic] June 30, 2009.[51]

Using identical phraseology, the contract recited terms for repayment of the composite units.[52]  The composite section listed two dates: June 30, 2009, for the first seventy-five units and December 31, 2009 for the remainder.[53]

As for future flatbed (and dropdeck) orders, "the payment terms is [sic] net 90 days after shipment FOB Shenzhen Port [sic]."[54]  "For existing flatbed [(and dropdeck)] orders which were signed or amended with signature between January 1, 2008 and September 9, 2008, whatever unit [sic] sold by DTLP will be paid off immediately after DTLP received [sic] payment from its

---

[50]    Id.

[51]    Id. (emphasis omitted).

[52]    Id.

[53]    Id.

[54]    Id. at p. 2 (emphasis omitted).

12

customer."[55]

At a later date, Li informed Nelson that Plaintiff needed to get Nelson to sign the Flatbed Agreement "because we didn't have a leg to stand on with our other agreements."[56]   As time passed, Defendants' costs for assembly, storage, and sales increased and the trailer sales prices decreased, creating a negative margin.[57] Defendants never sent the actual sale prices of the flatbed trailers to Plaintiff for an adjustment on any particular purchase order and, prior to the fall of 2009, did not request an accounting or, as the parties referred to the price adjustments, a "true-up."[58] As of July 2011, the last forty-two trailers using frame weldments that Plaintiff had shipped to Defendants were being completed for sale.[59]   According to Quaid, Defendant DCEC's chief financial officer, Defendants, at the time, owed Plaintiff for 395 units of frame weldment that had been delivered.[60]   Nelson averred that Li agreed that Defendant DTLP could pay for the frame weldments as the

---

[55]     Id. (emphasis omitted).

[56]     Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 154-55.

[57]     Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 12; Doc. 48-1, Ex. D to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Quaid, ¶¶ 2, 3, 8.

[58]     Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, p. 180; Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, pp. 160-61; see also Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 6.

[59]     See Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, pp. 217-18.

[60]     Id. at p. 218.

trailers incorporating them were sold.[61]   Additionally, Plaintiff retained a quantity of frame weldments that it had manufactured because purchase orders were put on hold or cancelled.[62]

## B.  **Procedural Background**

Plaintiff filed this contract action on March 4, 2010.[63] Plaintiff identified six causes of action: breach of the Master Agreement; breach of the Flatbed Agreement; avoidance under the Convention on Contracts for the International Sale of Goods; quantum meruit; and promissory estoppel.[64]   Defendants filed their answer and counterclaim on April 20, 2010.[65]   In a list containing both defenses and counterclaims without differentiation, Defendants asserted that Plaintiffs' claims were barred, in whole or in part, by: mutual mistake; defect in the parties; prior breach and offset (including a reference to Plaintiff's having been "unjustly enriched"); breach of fiduciary duty; release, modification, and novation; estoppel, misrepresentation, and fraudulent inducement;

---

[61]     Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 13.

[62]     See Doc. 42-1, Ex. C to Pl.'s Mot. for Partial Summ. J., Dep. of Quaid, 192; Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson, p. 159.

[63]     See Doc. 1, Pl.'s Original Compl.

[64]     Id. at pp. 5-11.

[65]     See Doc. 9, Defs.' Original Answer & Countercl.

14

and waiver.[66]  Defendants also sought an accounting.[67]

Both parties sought, and the court allowed, leave to amend their pleadings.[68]  Defendants' proposed amended pleading clarified their allegations concerning representations made by Plaintiff during negotiations and those regarding breaches of fiduciary duties.[69]  On the same day as Defendants filed their amended pleading, Plaintiff filed an amended complaint seeking damages for the cost of parts and materials purchased from third parties for the manufacture of the units of frame weldment that Plaintiff had agreed to purchase from Defendants.[70]  A few weeks later, Defendants filed their answer to Plaintiff's amended complaint in which they made only modest changes in the defenses and counterclaims section.[71]

In August 2011, Defendants filed another motion for leave to amend their answer and counterclaim.[72]  Therein, Defendants sought

---

[66]   Id. at pp. 6-9.

[67]   Id. at p. 9

[68]   See Doc. 15, Pl.'s Unopposed Mot. for Leave to Amend its Original Compl; Doc. 17, Defs.' Unopposed Mot. for Leave to Amend Defs.' Original Answer & Countercl.; Doc. 19, Order Dated Oct. 4, 2010 (granting Plaintiff's motion); Doc. 21, Order Dated Oct. 4, 2010 (granting Defendants' motion).

[69]   See Doc. 22, Defs.' 1st Am. Original Answer & Countercl.

[70]   See Doc. 20, Pl.'s 1st Am. Compl.

[71]   See Doc. 26, Defs.' 1st Am. Answer & Countercl. to Pl.'s 1st Am. Compl. Although a more accurate title for the document would have been simply "Defendants' Answer and Counterclaim to Plaintiff's First Amended Complaint," in order to avoid confusion, the court refers to it by the title Defendants assigned it.

[72]   See Doc. 38, Defs.' Mot. for Leave to File 2d Am. Answer & Countercl.

to amend in order to remove the "defense of mistake with regard to the parties to the Master Agreement" and the "counterclaim for breach of fiduciary duty," to add "the affirmative defense of failure to mitigate damages," and to clarify "Defendants' allegations with regard to the requirement of a true-up and the prices stated in the Master Agreement and purchase orders executed by the parties."[73]  The proposed amendment also omitted Defendants' allegation of defect in the parties.[74]

Shortly thereafter, Plaintiff filed the pending motion for partial summary judgment based on Defendants' live pleading.[75] Before responding to Plaintiff's motion, Defendants filed an amended motion for leave to amend their answer and counterclaim.[76] In addition to the changes listed in their original motion to file a second amended answer, they sought to add a defense of ambiguity, in the alternative.[77]  On September 30, 2011, Defendants responded to Plaintiff's summary judgment motion.[78]   In response to Defendants' summary judgment evidence, Plaintiff filed the pending

---

[73]     Id. at p. 2.

[74]     Compare Doc. 26, Defs.' 1st Am. Answer & Countercl. to Pl.'s 1st Am. Compl. with Doc. 38-1, Ex. A to Defs.' Mot. for Leave to File 2d Am. Answer & Countercl., Defs.' 2d Am. Answer & Countercl.

[75]     See Doc. 42, Pl.'s Mot. for Partial Summ. J.

[76]     See Doc. 47, Am. Mot. for Leave to File 2d Am. Answer & Countercl.

[77]     Id. at p. 2.

[78]     See Doc. 43, Defs.' Unopposed Mot. for Continuance; Doc. 44, Order Dated Sept. 13, 2011; Doc. 48, Defs.' Resp. to Pl.'s Mot. for Partial Summ. J.

motion to strike portions of Nelson and Quaid's affidavits.[79]

On October 13, 2011, the court held a hearing on Defendants' motion for leave to amend, among other things, and found good cause to allow the amendment.[80]  Within a few weeks of the court's ruling, Plaintiff filed the pending motion to strike certain affirmative defenses under Federal Rule of Civil Procedure ("Rule") 12(f) and to dismiss certain counterclaims under Rule 12(b)(6).[81]  The court denied Defendants another opportunity to amend their answer.[82]

Before addressing the overlapping challenges in Plaintiff's two dispositive motions, the court begins with Plaintiff's nondispositive motion.

## II.  Motion to Strike Affidavit Testimony

Plaintiff asks the court to strike portions of both Nelson and Quaid's affidavits because they are conclusory[83] and to strike portions of Nelson's affidavit because they contradict his sworn

---

[79]      See Doc. 54, Pl.'s Mot. to Strike Portions of the Affs. of Nelson & Quaid.

[80]      See Doc. 60, Min. Entry Dated Oct. 13, 2011; Doc. 75, Tr. of Hearing Dated Oct. 13, 2011, pp. 14–15.

[81]      See Doc. 67, Pl.'s Mot. to Strike Affirmative Defenses & to Dismiss Countercls.

[82]      See Doc. 95, Order Dated May 15, 2012.

[83]      Plaintiff mentions hearsay in summarizing its argument, but fails to identify any portion of either affidavit containing hearsay.  See Doc. 54, Pl.'s Mot. to Strike Portions of the Affs. of Nelson & Quaid.

deposition testimony.[84]  With regard to Plaintiff's assertion that Nelson and Quaid's affidavits contain conclusory statements, the court finds that the portions to which Plaintiff objects are based on the facts as perceived by the affiants and contain admissible testimony.   Plaintiff's assertion that Nelson's affidavit contradicts his deposition requires more discussion.

A   nonmoving   party   cannot   defeat   summary   judgment   by introducing an affidavit that directly conflicts with, without explanation, his prior deposition testimony.  S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 495 (5th Cir. 1996); see also Copeland v. Wasserstein, Perella & Co., Inc., 278 F.3d 472, 482 (5th Cir. 2002).   A subsequent affidavit may supplement or explain prior testimony and not run afoul of this rule.   See S.W.S. Erectors, Inc., 72 F.3d at 495-96 (Clark v. Resistoflex Co., 854 F.2d 762, 766 (5th Cir. 1988); Kennett-Murray Corp. v. Bone, 622 F.2d 887, 894 (5th Cir. 1980)).

Plaintiff   focuses   on   the   portion   of   Nelson's   affidavit discussing the execution of the Flatbed Agreement:

> David Li represented to me that the only reason CIMC needed the Flatbed Agreement executed was to provide an accelerated payment schedule for outstanding purchase orders due to CIMC's internal company policies.  I relied on David Li's representations, which were the only reason I executed the Flatbed Agreement.   David Li later admitted to me that CIMC wanted the Flatbed Agreement

---

[84]     Plaintiff also contends that Nelson and Quaid's affidavits contain parol evidence.  See id.  However, the court's decision on ambiguity, discussed subsequently in this memorandum, renders that argument moot.  See infra at pp. 24-32 & nn.89-101.

executed to bolster CIMC's litigation position.[85]
Plaintiff contends that the above statements contradict Nelson's
deposition testimony that Plaintiff "was needing some additional
support . . . to try to come up with some time frame of which [sic]
we could have this paid by . . . maybe he was trying to put some
closure to – to where this thing is."[86]   As Plaintiff points out,
Nelson also stated in his deposition that he did not believe that
Li misrepresented a fact or that Li said anything untrue to get
Nelson to sign the Flatbed Agreement.[87]

At other times during the deposition, though, Nelson explained
his understanding of the purpose of the Flatbed Agreement.

> I can tell you that we had a conversation and [Li]
> was telling me, "We've got to bring this thing to some
> sort of a – of a – of a[n] end on here in some way with
> our internal people."
>
> . . . .
>
> Well, I thought the flatbed agreement was that – the
> purpose was to take over DTLP, move the DCEC to DTLP
> issues [sic], and then I thought it was also to specify
> a time frame of which we were going to pay him off; okay?
> Now, what I didn't fully understand, maybe, is
> later, after that, setting [sic] in [Li's] office, he
> told me, "We had to get you to sign the flatbed agreement
> because we didn't have a leg to stand on with our other
> agreements."
> I said, "Well, [Li], so what are you telling me?
> You snookered me?  Is that what you're telling me?  You

---

[85]   Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J.,
Aff. of Nelson, ¶ 14.

[86]   Doc. 54-1, Ex. A to Pl.'s Mot. to Strike Portions of Nelson & Quaid's
Affs., Dep. of Nelson, p. 133.

[87]   Id. at pp. 141, 157-58.

snookered me?"

   And, he says, "No, I'm not telling you.   I'm just telling you we needed the flatbed agreement signed, so we pushed you to sign it."

. . . .

   I think we stressed the fact that the flatbed agreement accomplished something that he needed to have accomplished over there and that is a definite time frame that he can put a closure to this, and – and we wanted that, too.

. . . .

   I – can't say who – I don't know what he meant by that statement.   I don't know.   I don't know what they meant by that statement.   I took it to mean it's – you know, there may be some sort of an ulterior motive, but I don't know what that meant.   Didn't make me feel very good.[88]

When Nelson's deposition testimony is taken as a whole, it does not directly contradict his affidavit.   In both, Nelson was consistent, albeit using different descriptions, about what he perceived at the time of execution to be the purpose of the Flatbed Agreement.   His affidavit stated that the Flatbed Agreement was executed "to provide an accelerated payment schedule for outstanding purchase orders due to CIMC's internal company policies," and, at the deposition, he referred to bringing "this thing" to some sort of an end with Plaintiff's "internal people" and specifying a time frame for paying the debt to Plaintiff.[89]   Likewise, his testimony was consistent on both occasions with

---

   [88]   _Id._ at pp. 138, 154-57.

   [89]   _Id._ at p. 138; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., Aff. of Nelson, ¶ 14.

regard to Li's subsequent revelation that Plaintiff wanted Defendants to sign the Flatbed Agreement for an entirely different reason, that is, to bolster Plaintiff's position in relation to Defendants.

The court finds that Nelson's subsequent affidavit supplemented his prior deposition, rather than contradicted it. Thus, per Fifth Circuit precedent, the affidavit should not be stricken.  Plaintiff's motion to strike portions of Nelson and Quaid's affidavit testimony is **DENIED**.

### III.  Dispositive Motions

In its two pending dispositive motions, Plaintiff seeks judgment in its favor on Defendant's claims of prior breach and offset, unjust enrichment, release, modification, novation, estoppel, misrepresentation, fraudulent inducement, waiver, and necessity of accounting.  Plaintiff also seeks summary judgment on its affirmative claims that Defendant breached both the Master Agreement and the Flatbed Agreement.

### A.  Applicable Legal Standards

Pursuant to Rule 12(b)(6), dismissal of an action is appropriate whenever the pleading, on its face, fails to state a claim upon which relief can be granted.  It need not contain "detailed factual allegations" but must include sufficient facts to indicate the plausibility of the claims asserted, raising the "right to relief above the speculative level." Bell Atl. Corp. v.

21

Twombly, 550 U.S. 544, 555 (2007); see also Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009). Plausibility means that the factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. 678.

"An affirmative defense is subject to the same pleading requirements as is the complaint." Woodfield v. Bowman, 193 F.3d 354, 362 (5th Cir. 1999). The standard articulated in Woodfield for defenses was "fair notice," which was consistent with the pleading standard at the time. See Woodfield, 193 F.3d at 362; Conley v. Gibson, 355 U.S. 41, 47 (1957). After the Twombly decision, the Fifth Circuit reiterated the "fair notice" standard for affirmative defenses. See Rogers v. McDorman, 521 F.3d 381, 385 (5th Cir. 2008).

However, a debate has surfaced post-Iqbal whether the standard for defenses remains "fair notice" or is now plausibility. Compare Floridia v. DLT 3 Girls, Inc., Civ. Action No. 4:11-cv-3624, 2012 WL 1565533, *2 (S.D. Tex. May 2, 2012)(slip copy)(employing the "fair notice" standard) with Vargas v. HWC Gen. Maint., LLC, Civil Action No. H-11-875, 2012 WL 948892, at *2 (S.D. Tex. Mar. 20, 2012)(slip copy)(finding that the plausibility standard applies to affirmative defenses); U.S. v. Brink, Civil Action No. C-10-243, 2011 WL 835828, *3 (S.D. Tex. Mar. 4, 2011)(unpublished)(same). This court leaves resolution of the issue to other courts because,

in this case, where the issue of the sufficiency of the pleading of affirmative defenses comes into play, the defenses do not meet even the more lenient "fair notice" standard.

Rule 12(f) grants courts the authority to strike from any pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." See also Cambridge Toxicology Group, Inc. v. Exnicios, 495 F.3d 169, 178 (5th Cir. 2007). Although generally disfavored, motions to strike are proper for defenses that, as a matter of law, are insufficient. See Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc., 677 F.2d 1045, 1057-58 (5th Cir. 1982). The trial court may use its discretion in deciding such motions. See Cambridge Toxicology Group, Inc., 495 F.3d at 178.

Summary judgment is warranted when the evidence reveals that no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Brown v. City of Houston, Tex., 337 F.3d 539, 540-41 (5th Cir. 2003). A material fact is a fact that is identified by applicable substantive law as critical to the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Ameristar Jet Charter, Inc. v. Signal Composites, Inc., 271 F.3d 624, 626 (5th Cir. 2001). To be genuine, the dispute regarding a material fact must be supported by evidence such that a reasonable jury could

resolve the issue in favor of either party.  <u>Anderson</u>, 477 U.S. at 250; <u>TIG Ins. Co. v. Sedgwick James of Wash.</u>, 276 F.3d 754, 759 (5th Cir. 2002).

The movant must inform the court of the basis for the summary judgment motion and must point to relevant excerpts from pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of genuine factual issues.  <u>Celotex Corp.</u>, 477 U.S. at 323; <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1131 (5th Cir. 1992).  If the moving party can show that the facts are not in dispute, the party opposing summary judgment must go beyond the pleadings and proffer evidence demonstrating that genuine issues of material fact do exist that must be resolved at trial.  See <u>Celotex Corp.</u>, 477 U.S. at 324.

When considering the evidence, "[d]oubts are to be resolved in favor of the nonmoving party, and any reasonable inferences are to be drawn in favor of that party."  <u>Evans v. City of Houston</u>, 246 F.3d 344, 348 (5th Cir. 2001); <u>see also</u> <u>Boston Old Colony Ins. Co. v. Tiner Assocs. Inc.</u>, 288 F.3d 222, 227 (5th Cir. 2002).  The court should not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  <u>Honore v. Douglas</u>, 833 F.2d 565, 567 (5th Cir. 1987).

**B.**  **<u>Analysis</u>**

Before the court can decide whether Plaintiff is entitled to judgment on the contract-related claims, it must first address

whether the contracts' terms were unambiguous.   See Specht v. Maximus Inc., 344 Fed. App'x 873, 881 (5th Cir. 2009)(unpublished) (applying Texas law); Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983).  By uniformly relying on Texas law, the parties agree that it applies to their controversy.   Absent any indication in the record that any other law should apply, the court applies Texas law.  See Arthur W. Tifford, PA v. Tandem Energy Corp., 562 F.3d 699, 705 n.2 (5th Cir. 2009)("[B]y failing to brief any other state's law, the parties have forfeited any choice of law argument.")

1. Ambiguity[90]

The meaning imparted by the language used in a contract can be decided as a matter of law unless it is ambiguous.  In re Newell Indus., 336 F.3d 446, 448 (5th Cir. 2003)(applying Texas law); DeWitt Cnty. Elec. Co-op., Inc. v. Parks, 1 S.W.3d 96, 100 (Tex. 1999); Coker, 650 S.W.2d at 393.  If the contract's meaning is certain or definite, the contract is unambiguous and will be enforced as written.   Anglo-Dutch Petroleum Int'l, Inc. v. Greenberg Peden, P.C., 352 S.W.3d 445, 451 (Tex. 2011); Wal-Mart Stores, Inc. v. Sturges, 52 S.W.3d 711, 728 (Tex. 2001).  In such a case, "parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different

_____

[90]   The court is persuaded by Plaintiff's objections that the Master Agreement is not latently ambiguous; however, the court finds that the accounting terms are, nevertheless, ambiguous as explained herein.

from that which its language imports." <u>Anglo-Dutch Petroleum Int'l, Inc.</u>, 352 S.W.3d at 451.

If, on the other hand, a contract is ambiguous, its meaning must be resolved by the trier of fact, and parol evidence and other extraneous evidence can be considered in determining the parties' true intent. <u>See</u> <u>Specht</u>, 344 Fed. App'x at 881; <u>Anglo-Dutch Petroleum Int'l, Inc.</u>, 352 S.W.3d at 451; <u>Coker</u>, 650 S.W.2d at 393. Because a determination of the parties' true contractual intent involves questions of fact, it must not be resolved on summary judgment. <u>Lenape Res. Corp.</u>, 925 S.W.2d at 574. Determining whether an ambiguity exists in the contract language rests in the hands of the court. <u>Addicks Servs., Inc. v. GGP-Bridgeland, LP</u>, 596 F.3d 286, 294 (5th Cir. 2010)(applying Texas law); <u>David J. Sacks, P.C. v. Haden</u>, 266 S.W.3d 447, 451 (Tex. 2008).

If the meaning is uncertain and doubtful or reasonably susceptible to more than one interpretation, the contract is ambiguous. <u>J.M. Davidson, Inc. v. Webster</u>, 128 S.W.3d 223, 229 (Tex. 2003)(citing <u>Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.</u>, 940 S.W.2d 587, 589 (Tex. 1996); <u>Coker</u>, 650 S.W.2d at 393. The court takes into consideration the circumstances present when the parties entered the contract when determining whether it is susceptible to two or more reasonable interpretations. <u>Lenape Res. Corp. v. Tenn. Gas Pipeline Co.</u>, 925 S.W.2d 565, 574 (Tex. 1996). To the extent possible, all provisions within the contract are read

together, and each is give effect so that no part of the agreement is left without meaning. Coker, 650 S.W.2d at 393. "In construing a contract in a business context, we bear in mind the particular business activity sought to be served and need not strain to apply rules of construction in an effort to avoid ambiguity at all costs." DeClaris Assocs. v. McCoy Workplace Solutions, L.P., 331 S.W.3d 556, 561-62 (Tex. App.–Houston [14th Dist.] 2011, no pet.)(citing Lenape Res. Corp., 925 S.W.2d at 574).

Here, the contracts in question are poorly written (or, perhaps, poorly translated).[91] The parties disagree on the interpretation of the Master Agreement primarily on two significant issues. Plaintiff asserts that the agreement did not require the division of losses, while Defendants contend that it did. The parties also disagree on whether a cumulative accounting or true-up was required.

Section 3 of the Master Agreement stated that the parties agreed to price the frame weldment units "based on real cost plus margin sharing" and included formulas for calculating the margin and the price of the frame weldment units.[92] The margin was to be equal to the sale price of a completed flatbed trailer minus the

---

[91] For example, context would dictate the use of the word "incurred," not "occurred" in Section 3. Doc. 42-1, Ex. A to Pl.'s Mot. for Partial Summ. J., Master Agreement, § 3. Other sentences are, to say the least, awkward: "Each party shall notice the counterparty the execution of cost reduction program occurred in its side for backup." Id.

[92] Id.

parties' respective costs.[93]   The price of the frame weldment was
to be equal to Plaintiff's costs plus one-half of the margin.[94]   The
contract dictated that "both parties shall share the margin
achieved equally."[95]

The term "margin" has several accounting or finance meanings,
but one of the definitions was reflected in the contract formula:
the difference between the cost and the sale price of goods.   See
also Webster's New World Dictionary 827 (3d College Ed.
1988)(defining "margin" as "the difference between the cost and the
selling price of goods produced, sold, etc.").   The term "margin"
is not inherently positive or negative.   Neither the contract
definition nor the dictionary definition preclude the possibility
of a negative margin.   The contract unambiguously allowed for the
sharing of either a profit or loss margin.

It is with regard to the other issue in contention that the
Master Agreement's meaning is uncertain.   The Master Agreement
stated that purchase orders for batches of frame weldment units
would be placed quarterly and that Plaintiff would provide
Defendant DCEC with the "real cost" of manufacturing and delivery
of the units of frame weldment.[96]   "The price per completed unit

---

[93]   Id.

[94]   Id.

[95]   Id.

[96]   Id. at §§ 1, 3.

shall be as detailed in the individual Purchase Orders mentioned above . . . . The actual margin difference brought by sale prices of Flat Bed Trailer and cost reduction program shall be accounted and the amount shall be reflected in the price of next individual Purchase Order."[97]

As the court understands the language, the purchase orders, which were to be placed quarterly, were to include the price per completed frame weldment. After the sale of the completed flatbed trailers, the margin was to appear as an adjustment on the next purchase order. The language was mandatory: "price . . . <u>shall</u> be detailed;" "<u>shall</u> be accounted;" and "<u>shall</u> be reflected in . . . next . . . Purchase Order."[98]

Both parties' interpretations of this provision are reasonable. Plaintiff contends that the section provided a method for adjusting frame weldment prices based on cost reductions or changes in the actual sales prices of the completed trailers. The amount of the difference between the agreed costs and sales prices and the actual costs and sales prices was to be reflected in the pricing of the frame weldments in the next purchase order. Plaintiff holds that the contract did not allow for a true-up of "the total profits and losses experienced for the entire

---

[97]   <u>Id.</u> at § 3.

[98]   <u>Id.</u> (emphasis added).

29

operation."[99]

Defendants offer a slightly different interpretation, focusing on the use of the term "real cost" in reference to pricing the frame weldments "based on real cost plus margin sharing." Defendants contend that the real costs were the actual costs each side expended in performing its portion of the contract.  In other words, real cost meant the actual amount it cost Plaintiff to manufacture and deliver the frame weldments to Defendants and the actual amount it cost Defendants to assemble and sell the trailers. Because the "real costs" were unknowable until they were actually incurred, Defendants argue, the contract requirement that the actual margin difference "shall be accounted" meant that the parties intended to account for the "differences between the estimated costs and target margins included in the purchase order prices and the actual costs and actual margins achieved when the completed flatbed trailers were sold."[100]

The court agrees with both.  The Master Agreement required that an accounting was to take place at the time of each quarterly purchase order and did not specifically provide for a cumulative accounting.  However, it also required that each accounting was to take into consideration the actual costs incurred by the parties in manufacturing the frame weldments and in assembling and selling the

---

[99]     Doc. 42, Pl.'s Mot. for Partial Summ. J., p. 12.

[100]    Doc. 48, Defs.' Resp. to Pl.'s Mot. for Partial Summ. J.

trailers made from the weldments.  As the contract contemplated one accounting per purchase order but designated two different times for the accounting to occur—at the time of the next purchase order and at the time that the actual costs became available, the court cannot give meaning to one without depriving the other of meaning. The Master Agreement was ambiguous with regard to when the accounting was to take place.

Like the Master Agreement, the Flatbed Agreement was not a monument to clarity.  The Flatbed Agreement contained two significant ambiguities on the face of the contract.  One instance was in the opening paragraph, which stated that Defendant DTLP "fully took over the Master Agreement" assigned by Defendant DCEC and "fully accept [sic] the benefits and obligations" of the Master Agreement and that Plaintiff "fully understood and accepted this assignment."[101]

Under Texas contract law, merely assigning a contract to a third party does not relieve a party of its obligations under the contract.  Seagull Energy E&P, Inc. v. Eland Energy, Inc., 207 S.W.3d 342, 346-47 (Tex. 2006).  Rather, the other party to the contract must explicitly or implicitly release the assignor from the contract obligations.  Id. at 347.

Both parties' interpretations of this provision are

---

[101]   Doc. 42-1, Ex. B to Pl.'s Mot. for Partial Summ. J., Flatbed Agreement, Introductory ¶.

reasonable.    Plaintiff  contends  that  Defendant  DCEC  was  not
relieved of its obligations because the Flatbed Agreement did not
expressly release  it.  Defendants counter  that the  chosen language
did reflect the intention to release Defendant DCEC.[102]  The court
agrees with both.  The Flatbed Agreement did not explicitly release
Defendant  DCEC.   However,  the  phrases  "fully  took  over,"  "fully
accept[ed]," and "fully understood and accepted" may be read as
implicitly  indicating  the  intention  to  release  Defendant  DCEC.
This comports with a common understanding of the meaning of "fully"
and with the emphasis created by its repetition.

     The second relevant ambiguity relates to the payment schedule.
The Flatbed Agreement stated, both in the paragraphs related to
steel units and in those related to composite units, that the units
from specific purchase orders which remained unpaid would be "paid
off immediately after" Defendant DTLP "received payment from its
customer."[103]  For both the steel units and the composite units, the
very next sentences set date-certain deadlines for the payment of
the balances.[104]  Neither paragraph addressed what should be done in
the event that Defendant DTLP had not received payment from its

---

     [102]    Defendants specifically argue that Defendant DCEC was a third-party
beneficiary of the Flatbed Agreement.  The court finds it unnecessary to address
this argument because the court finds that the contract could be reasonably read
to implicitly release Defendant DCEC.

     [103]    Doc. 42-1, Ex. B to Pl.'s Mot. for Partial Summ. J., Flatbed
Agreement, ¶¶ 1, 2.

     [104]    <u>Id.</u>

customer(s) for the trailer sales before the date-certain deadline.[105]  On its face, the agreement is unclear whether the payment due date is "immediately after" payment by Defendant DTLP's customer or is the date certain listed in each paragraph.

The court, thus, finds the Master Agreement ambiguous with regard to the mandatory accounting provision and the Flatbed Agreement ambiguous with regard to release and to payment deadlines.  Because both the Master Agreement and the Flatbed Agreement contained ambiguities, the jury must determine the parties' true intent.  Lenape Res. Corp., 925 S.W.2d at 574.

Based on the finding that the two agreements contained ambiguities, summary judgment is therefore inappropriate with regard to any claim that depends on the interpretation of the contracts.[106]  Obviously, the breach of contract and offset claims cannot be decided until the fact issues regarding the parties' rights and obligations under the contracts are resolved.

Defendants' claims of release, modification, novation,[107] and waiver all relate to the effect of the Flatbed Agreement on the contractual rights of the parties.  Before the court can determine

---

[105]     See id.

[106]     In addition to the affirmative defenses and counterclaims that survive because of the existence of ambiguities in the contracts, Defendants also raised the defense of failure to mitigate that was not challenged by Plaintiff.

[107]     Defendants omitted novation from its third amended complaint, which the court struck.  See Doc. 68, Defs.' 3d Am. Answer & Countercl.; Doc. 95, Order Dated May 15, 2012.  Additionally, Defendants have not consistently defended the claim against Plaintiff's challenges.  It is unclear whether Defendants intend to pursue this claim.

whether the Flatbed Agreement released Defendant DCEC, modified the Master Agreement by introducing new elements, created new obligations through novation, or evidenced a waiver of any right of Plaintiff, a jury must determine the meaning of the initial paragraph and the payment terms.

Defendants' request for an accounting is based on the complexity of the parties' transactions.  Before the court can assess whether they are entitled to an accounting, the jury must decide whether the mandatory accounting provision in the Master Agreement allows for a cumulative true-up.

    2.  <u>Unjust Enrichment</u>[108]

Under Texas law, unjust enrichment is not considered an independent cause of action; rather, it is a theory of recovery that allows for restitution "when a party receiving property or benefits would be unjustly enriched if it were permitted to retain the property or benefits at the expense of another." <u>Heldenfels Bros., Inc. v. City of Corpus Christi</u>, 832 S.W.2d 39, 43 (Tex. 1992); <u>see also</u> <u>Excess Underwriters at Lloyd's, London v. Frank's Casing Crew & Rental Tools, Inc.</u>, 246 S.W.3d 42, 62 n.24 (Tex. 2008)(quoting <u>Heldenfels Bros., Inc.</u>, 832 S.W.2d at 41, as stating that restitution is a recognized remedy for unjust enrichment "[w]hen one person has obtained a benefit from another by fraud,

_____

[108]    Defendants omitted unjust enrichment from its third amended complaint, which the court struck.  <u>See</u> Doc. 68, Defs.' 3<sup>d</sup> Am. Answer & Countercl.; Doc. 95, Order Dated May 15, 2012.  The court addresses it here because, at the time of this memorandum, it remains a claim in this lawsuit.

duress, or the taking of an undue advantage"). Unjust enrichment is an equitable doctrine that applies only in the absence of an actual contract. <u>Mowbray v. Avery</u>, 76 S.W.3d 663, 679 (Tex. App.–Corpus Christi 2002, pet. struck); <u>see also</u> <u>Frank's Casing Crew & Rental Tools, Inc.</u>, 246 S.W.3d at 51 (discussing the Supreme Court of Texas' reluctance to allow rewriting of a contract based on an equitable unjust-enrichment theory).

Here, Plaintiff challenges Defendants' assertion of unjust enrichment based on the existence of a contract that covered the payment arrangements, rendering equitable relief improper. In their live pleading, Defendants' sole reference to unjust enrichment is their assertion that Plaintiff was "unjustly enriched" by Defendants' overpayments for frame weldments due to the inclusion of target margins.[109]  Defendants fail to address Plaintiff's specific argument and, instead, simply maintain that they have a right to a true-up.

The court finds that Defendants cannot recover under the doctrine of unjust enrichment because the parties have entered contracts that, although ambiguous, include payment terms.

3.  <u>Estoppel, Fraudulent Inducement, and Misrepresentation</u>

The doctrine of estoppel "generally prevents one party from misleading another to the other's detriment or to the misleading party's own benefit." <u>Ulico Cas. Co. v. Allied Pilots Ass'n</u>, 262

---

[109]    Doc. 62, Defs.' 2<sup>d</sup> Am. Answer & Countercl., ¶ 51.

S.W.3d 773, 778 (Tex. 2008).  The elements of such a claim are: "(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of those facts; (3) with the intention that it should be acted on; (4) to a party without knowledge or means of obtaining knowledge of the facts; (5) who detrimentally relies on the representations." Id. (quoting Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc., 962 S.W.2d 507, 515-16 (Tex. 1998)).

Fraudulent inducement[110] requires proof that: "(1) a material representation was made; (2) it was false when made; (3) the speaker either knew it was false, or made it without knowledge of its truth; (4) the speaker made it with the intent that it should be acted upon; (5) the party acted in reliance; and (6) the party was injured as a result." Fluorine on Call, Ltd. v. Fluorogas Ltd., 380 F.3d 849, 858 (5th Cir. 2004)(quoting Coffel v. Stryker Corp., 284 F.3d 625, 631 (5th Cir. 2002))(applying Texas law); see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 47-48 (Tex. 1998).

Under Texas law, a plaintiff must satisfy four elements to prove negligent misrepresentation: 1) a defendant made a

---

[110]    Although consisting of the same elements of proof as a fraud claim, fraudulent inducement is "a particular species of fraud that arises only in the context of a contract and requires the existence of a contract as part of its proof." Haase v. Glazner, 62 S.W.3d 795, 798 (Tex. 2001); see also Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc., 960 S.W.2d 41, 52 (Tex. 1998)(stating that "when a party fraudulently procures a contract by making a promise without any intent of keeping the promise in order to induce another into executing the contract, a tort cause of action for that fraud exists.").

representation in the course of business or in a transaction in which the defendant had a pecuniary interest; 2) the defendant provided false information for the guidance of another in business; 3) "the defendant did not exercise reasonable care or competence in obtaining or communicating the information;" and 4) the plaintiff suffered pecuniary loss in the justifiable reliance on the representation.  Henry Schein, Inc. v. Stromboe, 102 S.W.3d 675, 686 n.24 (Tex. 2002)(quoting Fed. Land Bank Ass'n of Tyler v. Sloane, 825 S.W.2d 439, 442 (Tex. 1991)); see also LHC Nashua P'ship, Ltd. v. PDNED Sagamore Nashua, L.L.C., 659 F.3d 450, 458 (5th Cir. 2011)(applying Texas law).

In its motions, Plaintiff challenges these all three of these claims[111] under the Rule 12(f) and the Rule 56 standards.  Plaintiff contends that Defendants failed to identify any misrepresentation and that they failed to meet the standards of Rule 9(b), which requires that claims of fraud or mistake be pled "with particularity" concerning "the circumstances constituting fraud or mistake."  With regard to negligent misrepresentation, Plaintiff argues that it is not recognized in Texas as a defense to a breach of contract claim, except in the context of an insurance contract.

Defendants assert that the same factual basis underlies all of

---

[111]    Both parties characterize these claims as defenses.  See Doc. 67, Pl.'s Mot. to Strike Affirmative Defenses & to Dismiss Countercls., p. 4; Doc. 48, Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., p. 31.  Although the live answer does not differentiate between those claims Defendants intended as defenses and those they intended as counterclaims, the court relies on the parties' characterizations.

these claims.  In their live pleading, Defendants presented the
following theory of misrepresentation:

> According to Plaintiff's representations to the
> Defendants, the prices stated in the purchase orders by
> which DTLP ordered frame weldments from CIMC, as well as
> the frame weldment prices stated in the Flatbed
> Agreement, were merely fillers necessary to satisfy
> CIMC's internal accounting policies.
>
> . . . .
>
> Plaintiff's personnel assured Defendants that the prices
> stated in the purchase orders and Flatbed Agreement were
> merely fillers intended to satisfy CIMC's internal
> policies, and were necessary to start production of the
> frame weldments. . . . Plaintiff further represented
> that, in the event certain flatbed trailer units had not
> been sold by the dates set forth in the Flatbed
> Agreement, the parties would make alternative payment
> arrangements.  Now[,] however, Plaintiff contends the
> target prices set forth in the purchase orders and the
> Flatbed Agreement are the actual amounts owed by DTLP for
> the frame weldments.[112]

However, in their response and surreply to Plaintiff's summary
judgment motion, Defendants focus on an entirely different
allegation, specifically, that Li represented to Nelson that
Plaintiff sought the Flatbed Agreement to be in compliance with its
internal policies and to reach a quicker resolution to the parties'
trailer dealings when, in fact, Plaintiff's motivation was to
improve Plaintiff's litigation position.[113]  Defendants' briefing
does not mention any misrepresentation regarding Plaintiff's

---

[112]    Doc. 62, Defs.' 2$^d$ Am. Answer & Countercl., ¶¶ 53-54.

[113]    See Doc. 48, Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., pp. 31-34; Doc. 66, Defs.' Surreply to Pl.'s Reply in Support of its Mot. for Partial Summ. J., pp. 8-10.

pricing of the weldments.[114]

Because Defendants have advanced two separate factual bases for estoppel, fraudulent inducement, and negligent misrepresentation, the court must examine whether Defendants have met their pleading and production burdens for either alleged basis. As to the allegations that Plaintiff represented that the purchase order prices for the frame weldments were "merely fillers" and that the parties would make alternative payment arrangements if the flatbed trailers did not sell by the frame weldment payment due dates, the court finds that Defendants pled allegedly false representations regarding the prices and the payment arrangements. However, they failed to plead any fact supporting the inference that Plaintiff intended Defendants to rely on those representations or that Defendants actually did rely on them. Therefore, the claims of estoppel, fraudulent inducement, and misrepresentation as to pricing and payment arrangements fail at the pleading stage.[115]

With regard to the alleged misrepresentation about the Flatbed Agreement, Defendants did not include any such allegation in their first four pleadings, even though they were well aware of the facts

---

[114]   See Doc. 48, Defs.' Resp. to Pl.'s Mot. for Partial Summ. J., pp. 31-34; Doc. 66, Defs.' Surreply to Pl.'s Reply in Support of its Mot. for Partial Summ. J., pp. 8-10.

[115]   The court notes that, because Defendants changed their factual foundation for these claims at the summary judgment stage, they pointed to no evidence supporting the elements of intent or reliance. Therefore, Defendants also failed to meet their summary judgment burden as to the pricing and payment-arrangement representations.

underlying this fraud theory prior to filing their live pleading.[116] They improperly amended in November 2011 to include facts supporting that theory of misrepresentation, but the court struck that pleading.[117]   Accordingly, Defendants failed to notify Plaintiff of the basis of their fraud-based claims regarding the Flatbed Agreement with the level of particularity required by Rule 9(b).

Because these claims should be dismissed for the above reasons argued by Plaintiff, the court does not reach the contention that negligent misrepresentation is not an allowable defense to a breach of contract claim of the sort raised in this case.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that both Plaintiff's Motion for Partial Summary Judgment and Plaintiff's Motion to Strike Affirmative Defenses and to Dismiss Counterclaims be **GRANTED IN PART AND DENIED IN PART**.   The court **DENIES** Plaintiff's motion to strike.

The Clerk shall send copies of this Memorandum, Recommendation, and Order to the respective parties who have

---

[116]     Defendants rely on Nelson's deposition and affidavit testimony as evidence of the fraud-based claims in relation to the Flatbed Agreement.  Nelson was deposed in early July 2011 and signed his affidavit in late September 2011, both prior to the filing of their live pleading.  Compare Doc. 42-1, Ex. D to Pl.'s Mot. for Partial Summ. J., Dep. of Nelson; Doc. 48-1, Ex. C to Defs.' Resp. to Pl.'s Mot. for Partial Summ. J. with Doc. 62, Defs.' 2$^d$ Am. Answer & Countercl.

[117]     See Doc. 68, Defs.' 3$^d$ Am. Answer & Countercl., ¶ 57; Doc. 95, Order Dated May 15, 2012.

fourteen days from the receipt thereof to file written objections thereto pursuant to Rule 72(b) and General Order 2002-13.   Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically.   Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 24th  day of August, 2012.

Nancy K. Johnson
United States Magistrate Judge